# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| Cliff DeTemple d/b/a Turning Point Systems Group, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE NO. 1-09-CV-03272-RWS |
| Leica Geosystems Inc., A Delaware corporation, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT LEICA GEOSYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**

Paul R. Hoefle, Esq. (WI #1005647)
Benjamin A. Menzel, Esq. (WI #1041472)
The Schroeder Group S.C., Attorneys at Law
20800 Swenson Drive, Ste. 475
Waukesha, WI  53186
Tel: (262) 754-1306
prh@tsglaw.com
bam@tsglaw.com
*(Pro Hac Vice)*

John V. Burch, Esq. (GA #094900)
Bovis Kyle & Burch, LLC
200 Ashford Center North, Suite 1500
Atlanta, GA  30338
Tel:  (770) 391-9100
jburch@boviskyle.com
*Counsel for Plaintiff Cliff DeTemple d/b/a Turning Point Systems Group*

# TABLE OF CONTENTS

Page(s)

INTRODUCTION...........................................................................1

FACTUAL BACKGROUND ........................................................2

ARGUMENT ................................................................................3

I.     SUMMARY JUDGMENT STANDARD. ...............................3

II.    PLAINTIFF HAS A SHARED COMMUNITY OF
INTEREST WITH LEICA. .......................................................5

A.    The WFDL Must Be Interpreted Broadly And
Seeks To Protect Small Businesses That Share A
"Community Of Interest" With A Grantor. .....................5

B.    Leica Had TPSG "Over A Barrel." ..............................8

1.    TPSG generated over 80% of gross sales and
gross profits from Leica Survey Products. ............10

2.    TPSG's sunk investments were substantial,
and largely not recoverable. ...............................12

C.    TPSG either satisfies the other *Ziegler* facets, or
raises genuine issues of material fact.  Summary
judgment cannot be granted. ..............................................15

1.    Leica imposed significant obligations upon
TPSG. .......................................................................15

2.    A large majority of TPSG's time and revenue
was devoted to Leica products. ...............................17

3.    TPSG extensively used Leica's trademarks
and logos. ...................................................................18

4.   TPSG's personnel was substantially devoted to Survey Products. ....................................20

5.   TPSG spent significant amounts to advertise and promote Survey Products and services. .........21

6.   Leica limited TPSG's sales territory......................22

7.   TPSG provided its customers additional services, which TPSG relied upon for sales of Survey Products. .........................................23

8.   The length of the relationship between TPSG and Leica is not dispositive......................................24

CONCLUSION ....................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen v. Bd. of Pub. Educ. For Bibb Cnty.,*
    495 F.3d 1306 (11th Cir. 2007) ................................................................4

*Baldewein Co. v. Tri-Clover, Inc.,*
    606 N.W.2d 145 (Wis. 2006) ......................................................14, 19

*Brio Corp. v. Meccano S.N.,*
    690 F. Supp. 2d 731 (E.D. Wis. 2010) ..................................... passim

*Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.,*
    482 F.Supp.2d 1065 (E.D. Wis. 2007) ..........................................11

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................4

*Cent. Corp. v. Research Prods. Corp.,*
    681 N.W.2d 178 (Wis. 2004)......................................................... passim

*Conrad's Sentry, Inc. v. Supervalu, Inc.,*
    357 F. Supp. 2d 1086 (W.D. Wis. 2005).........................................8

*Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.,*
    846 F.2d 1095 (7th Cir. 1988) .......................................................22

*Foerster, Inc. v. Atlas Metal Parts Co.,*
    313 N.W.2d 60 (Wis. 1981) .........................................................19

*Frieburg Farm Equip., Inc. v. Van Dole, Inc.,*
    978 F.2d 395 (7th Cir. 1992)...........................................9, 10, 11, 17

**Page(s)**

CASES

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America,*
549 F.3d 1079 (7th Cir. 2008) ..................................................6, 8

*Guderjohn v. Loewen-Am.,Inc.,*
507 N.W.2d 115 (Wis. Ct. App. 1993)..........................11, 16, 17, 22

*H. Phillips Co., Inc. v. Brown-Forman Distillers Corp.,*
483 F.Supp. 1289 (W.D. Wis. 1980) ..................................22

*Home Protective Servs., Inc. v. ADT Sec. Servs., Inc.,*
438 F.3d 716 (7th Cir. 2006) ............................................9

*Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Products, Inc.,*
255 F.3d 460 (7th Cir. 2001)..............................................8

*Sales & Mktg. Assoc., Inc. v. Huffy Corp.,*
57 F.3d 602 (7th Cir. 1995)......................................10, 17

*Super Natural Distributors, Inc. v. Muscletech Research and Development,*
196 F.Supp.2d 761 (E.D. Wis. 2002) ................................24

*Van Groll v. Land O'Lakes, Inc.,*
310 F.3d 566 (7th Cir. 2002)............................................19

*Water Quality Store, LLC v. Dynasty Spas, Inc.,*
789 N.W.2d 595 (Wis. Ct. App. 2010) ..............................11

*Ziegler Co. v. Rexnord, Inc.,*
407 N.W.2d 873 (Wis. 1987)................................. passim

## STATUTES

*Wis. Stat.* § 135.02(3)(a) ................................................................................6

*Wis. Stat.* § 135.025(2) ..................................................................................5

*Wis. Stats.* §§ 135.03, 135.04, and 135.045 ................................................3

## RULES

Fed. R. Civ. P. 56(c) .......................................................................................4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| Cliff DeTemple d/b/a Turning Point Systems Group, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | NO. 1-09-CV-03272-RWS |
| Leica Geosystems Inc., A Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT LEICA GEOSYSTEMS, INC.'S MOTION FOR SUMMARY
JUDGMENT**

## <u>INTRODUCTION</u>

In September, 2006, Leica terminated its agreement with Cliff DeTemple d/b/a Turning Point Systems Group ("TPSG"). The nature of the relationship between TPSG and Leica Geosystems, Inc. ("Leica") shows that a "dealership" existed, as defined under Wisconsin's Fair Dealership Law (the "WFDL"). Leica terminated its agreement with TPSG without complying with the WFDL's requirements. TPSG is, therefore, entitled to damages, including, but not limited to, actual costs and reasonable attorney's fees.

1

Leica now seeks to dismiss TPSG's claim for Leica's violation of the WFDL. As set forth herein, there are genuine issues of material fact. Therefore, Leica's motion must be denied.

## FACTUAL BACKGROUND[1]

In 2002, DeTemple formed Turning Point Systems Group ("TPSG"). Dkt. 45-14, Affidavit of Benjamin A. Menzel, dated June 29, 2012 ("Menzel Aff."), Ex. A at 29:22-23; Ex. F at ¶7.[2] In April 2003, TPSG entered into a Distribution Agreement between Turning Point Systems Group and Leica Geosystems, Inc. (the "Survey Contract"). *Id.*, Ex. F at ¶9, Ex. 2. The Survey Contract allows TPSG to market and sell Leica survey products ("Survey Products"). *Id.* TPSG also entered into a Service Agreement (the "Service Contract") with Leica to service and repair Survey Products. *Id.* at ¶10, Ex. 3.

In 2004, TPSG began selling Survey Products in certain parts of Wisconsin under the terms of the Survey Contract. Menzel Aff., Ex. F at ¶11.

---

[1] Additional facts are set forth in the Argument section of this Memorandum. Additional citations to the record are provided appropriately.

[2] TPSG relies primarily on the same arguments (with additional case law) and facts to show there are genuine issues of material fact which preclude summary judgment. Dkts. 45, 45-14 (with Exhibits A-M), 45-15 and 47. With respect to any additional facts, TPSG is filing herewith its Supplement to its Statement of Undisputed Facts.

1157885_1.DOC

TPSG was the exclusive dealer in this region.  *Id.*, Ex. F at ¶9, Ex. 2; *see also*, *infra*, at Section II.B.6.  TPSG sold over $500,000.00 of Leica product in 2005, and as a result, Leica presented TPSG with a sales award.  *Id.* at ¶29. On September 29, 2006, TPSG received notice that Leica was terminating the Survey Contract, effective December 28, 2006.  *Id.,* Ex. E at ¶2; Ex. K.   At or about the end of 2006, Leica also terminated the Service Contract.

In March, 2008, TPSG commenced a legal action against Leica, alleging a violation of the WFDL.[3]  TPSG alleges Leica violated the WFDL by terminating the Survey Contract without good cause, failing to provide TPSG 60 days to cure any claimed deficiency, and failing to repurchase TPSG's equipment and parts inventory.  Amended Complaint, Dkt. 8, at ¶¶40, 41, 43; *see also Wis. Stats.* §§ 135.03, 135.04, and 135.045.  As a result of these violations, TPSG is entitled to damages, including but not limited to reasonable attorney's fees and actual costs.  *Id.* at ¶44.

## **ARGUMENT**

## I.    **SUMMARY JUDGMENT STANDARD.**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[3] On August 11, 2014, the United States Court of Appeals for the Eleventh Circuit ruled DeTemple d/b/a TPSG's action was filed timely.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). However, "to the extent that evidence conflicts at summary judgment, the district court has an obligation to 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Allen v. Bd. of Pub. Educ. For Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (*quoting Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Id.* (*citing Samples ex rel. Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). Furthermore, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (*quoting Anderson,* 477 U.S. at 255).

## II.   PLAINTIFF HAS A SHARED COMMUNITY OF INTEREST WITH LEICA.

### A.   The WFDL Must Be Interpreted Broadly And Seeks To Protect Small Businesses That Share A "Community Of Interest" With A Grantor.

Wis. Stat. § 135.025(2) states:

> The underlying purposes and policies of the [WFDL] are:
>
> (a) to promote the compelling interest of the public in fair business relations between dealers and grantors, and the continuation of dealerships on a fair basis;
> (b) to protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;
> (c) to provide dealers with rights and remedies in addition to those existing by contract or common law;
> (d) to govern all dealerships, including any renewals or amendments to the full extent consistent with the constitutions of the state and the United States.

The Wisconsin Supreme Court has said "the WFDL 'shall be liberally construed and applied to promote its underlying remedial purposes and policies.'" *Cent. Corp. v. Research Prods. Corp.*, 681 N.W.2d 178, 187 (Wis. 2004) (*quoting Wis. Stat.* § 135.025(1)).[4]   "The WFDL's purposes are to promote the public's

---

[4] "[U]nder *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court must follow state law in a diversity case." *State Farm Mut. Auto. Ins. Co. v. Bates*, 542 F. Supp. 807, 821 (N.D. Ga. 1982).

interest in the relationships between dealers and grantors, and to protect dealers from unfair treatment by grantors, who use their superior economic and bargaining powers to the disadvantage of small business owners." *Id.* at 186.

For the WFDL to apply, a "dealership" must exist.  Three requirements must be met:

> First, there must be a contract or agreement between the two parties.  Second, that the agreement provide the grantee the right to do one of three things: (1) sell goods or services; (2) distribute goods or services; or (3) use the grantor's trademarks, names, logos, or other commercial symbols.  Third, that there exist a "community of interest" between the parties "in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise."

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America*, 549 F.3d 1079, 1090-91 (7th Cir. 2008) (*quoting Wis. Stat. §* 135.02(3)(a)).  Leica's motion is based solely on whether a "community of interest" exists.

Courts use two "guideposts" to determine whether a community of interest exists between a dealer and grantor: (1) a "continuing financial interest" in the relationship between the dealer and grantor; and (2) "interdependence" evidenced by "the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their

business relationship." *Ziegler Co. v. Rexnord, Inc.*, 407 N.W.2d 873, 878-79 (Wis. 1987).    In *Ziegler*, the Court set forth ten factors, or "facets," to consider.[5]   "Each of the facets may relate to one or both of the guideposts" and are not intended to be all-inclusive. *Id.* at 880.   The Wisconsin Supreme Court has "stressed the importance of considering *all facets* of a business relationship, as reflected in the parties' *actual dealings,* and not limiting the inquiry to one deficient factor." *Cent. Corp.*, 681 N.W.2d at 188 (emphasis

---

[5] The ten facets are:

> how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantors grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investments in inventory, facilities, and goodwill of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id.* at 879-80.

added) (citing *Ziegler,* 407 N.W.2d at 879).   Courts have consistently applied *Central Corp.*'s broad application of the WFDL by analyzing each of the *Ziegler* factors.   *Girl Scouts of Manitou Council, Inc.*, 549 F.3d 1079; *Conrad's Sentry, Inc. v. Supervalu, Inc.*, 357 F. Supp. 2d 1086 (W.D. Wis. 2005); *Brio Corp. v. Meccano S.N.*, 690 F. Supp. 2d 731 (E.D. Wis. 2010). Finally, "[i]n weighing the various *Ziegler* facets of the parties' relationship that bear upon the community of interest question, [the] Court is obligated to construe the facts in a light most favorable to [the non-movant, TPSG]." *Brio Corp.,* 690 F.Supp.2d at 750.

### B.   Leica Had TPSG "Over A Barrel."

Leica asserts it did not have TPSG "over a barrel" and therefore, there is no community of interest.   A dealer is "over a barrel … [i]f a dealer invests heavily in the promotion of the manufacturer's brand [because] the manufacturer may be tempted to threaten the dealer with termination unless the dealer knuckles under to the manufacturer's demands, since termination would prevent the dealer from recouping his brand-specific investment." *Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Products, Inc.*, 255 F.3d 460, 464-65 (7th Cir. 2001).

1157885_1.DOC

Courts have determined that whether a community of interest exists is determined based on the "totality of the circumstances," *Frieburg Farm Equip., Inc. v. Van Dole, Inc.*, 978 F.2d, 395, 399 (7th Cir. 1992), and have narrowed the "over a barrel" inquiry to two particular circumstances: "(1) the percentage of revenues and profits the alleged dealer derives from the grantor and (2) the amount of time and money an alleged dealer has sunk into the relationship." *Brio Corp.*, 690 F. Supp. 2d at 741 (*citing Home Protective Servs., Inc. v. ADT Sec. Servs., Inc.*, 438 F.3d 716, 719 (7th Cir.2006)); *see also Frieburg Farm Equip., Inc.*, 978 F.2d at 399. Furthermore, "some combination of revenues and investments could manifest a community of interest, even if neither could standing alone." *Frieburg Farm Equip., Inc.*, 978 F.2d at 399 (citations omitted).

Leica Survey Products accounted for a large majority of TPSG's gross sales, growing to over 80% in 2006, and generated no less than 80% of TPSG's gross profits, and in 2005, over 500% of gross profits. TPSG also had significant "sunk investments," including a Leica-specific showroom, a building which was purchased and used predominantly for Leica Survey Products, and almost $1.5 million in inventory purchased (including over $200,000.00 remaining after termination).

1157885_1.DOC

Finally, TPSG's ability to replace Survey Products is not dispositive. *Frieburg Farm Equip., Inc.*, 978 F.2d at 400 (dealership existed even though dealer sold other manufacturers' products). *Ziegler* stresses that the proper analysis is whether termination "*would* have a significant economic impact on the alleged dealer." 407 N.W.2d at 879 (emphasis added); *see also Water Quality Store, LLC*, 789 N.W.2d at 603. Removing over 80% of a company's gross sales and gross profits would have a significant economic impact. Menzel Aff., Ex. F at ¶15, Ex. 8 and ¶26; Ex. J; Ex. F.

These facts, and others discussed below, raise genuine issues of material fact as to whether Leica had TPSG "over a barrel" and whether a community of interest existed. Leica's motion for summary judgment must be denied.

### 1. TPSG generated over 80% of gross sales and gross profits from Leica Survey Products.

With respect to gross proceeds or profits, "[t]there is no bright line percentage test." *Brio Corp.*, 690 F.Supp.2d at 744. In *Brio Corp.*, the court found that gross proceeds which increased from 16.5% to 37.7% over a four-year time was a "significant percentage of business [and] an important indicator that there is a community of interest." *Id.* at 750; *see also Sales & Mktg. Assoc., Inc. v. Huffy Corp.*, 57 F.3d 602, 606 (7th Cir. 1995) (23% of

revenues enough to find community of interest); *Frieburg Farm Equip., Inc.*, 978 F.2d at 400 ("Even a proportion as low as 11% can suffice if a relationship exhibits…other characteristics of a community of interest."); *Cent. Corp.*, 681 N.W.2d at 189 (where dealer's gross sales were comprised of 8% to 9% of grantor's goods, although "the sale of [the alleged dealer's] products does not comprise a large percentage of Central Corp.'s gross revenues or profits, *this fact alone is not dispositive*, but is a matter to be weighed by the trier of fact" (emphasis added)); *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F.Supp.2d 1065, 1073 (E.D. Wis. 2007) (75% of revenues and profits satisfy *Ziegler* facet); *Guderjohn v. Loewen-Am.,Inc.*, 179 Wis. 2d 201, 507 N.W.2d 115, 119 (Wis. Ct. App. 1993) (sales of 19% to 26% of grantor's goods "tend[ed] to show a community of interest").

From 2004 to 2006, TPSG's gross sales from Leica Survey Products increased from 65.4% to 80.5%.   Menzel Aff., Ex. F at ¶¶20, 23, 26 and Ex. 8. And, in 2005, Leica awarded TPSG a sales award. *Id.*, Ex. F at ¶29. This suggests interdependence between TPSG and Leica.   *Water Quality Store, LLC v. Dynasty Spas, Inc.*, 789 N.W.2d 595, 607 (Wis. Ct. App. 2010) (grantor awarding dealer a "partnership award" and "preferred dealer" awards

shows "additional evidence of interdependence").   During the same time period, TPSG's gross profits from Leica Survey Products did not fall below 81.9%, and, due to significant losses from Leica HDS Products, gross profits from Leica Survey Products accounted for over 500% in 2005.  Menzel Aff., Ex. F at ¶15, Ex. 8; Ex. J.[6]  This fact weighs heavily in favor of finding a community of interest existed between TPSG and Leica.

### 2. TPSG's sunk investments were substantial, and largely not recoverable.

Leica requested that TPSG have a dedicated showroom.   To do so, TPSG purchased a building at a cost of $245,000.  Menzel Aff., Ex. A, at 89:7-90:9; Ex. F at ¶30, Ex. 9.  Of the building's 6,588 square feet, 80% was used for Survey Products.   TPSG used 2,500 square feet of the building's warehouse to train customers on Survey Products.  *Id.*, Ex. F at ¶35.  The building had 2,000 square feet of office space, which was used predominantly

---

[6] TPSG's gross sales and gross profits from Leica Survey Products from 2004 to 2006 were as follows:

| Year | Gross Sales | Leica Survey | % | Gross Profit | Leica Survey | % |
|------|-------------|--------------|------|--------------|--------------|--------|
| 2004 | $ 49,433 | $ 32,324 | 65.4% | $ 18,933 | $ 16,753 | 88.5% |
| 2005 | $592,025 | $455,359 | 76.9% | $ 16,139 | $ 85,359 | 528.9% |
| 2006 | $870,167 | $700,805 | 80.5% | $260,767 | $254,231 | 81.9% |

Menzel Aff., Ex. F at Ex. 8.

for sales of Survey Products and servicing Survey Products customers. *Id.* at ¶¶31-35, 39, 42-46. TPSG specifically dedicated about 750 square feet of the office space as a showroom for Leica products, 90% of which was for Survey Products. *Id.* at ¶¶31-33. The approximate cost of the equipment for the showroom was $300,000, of which, $200,000 was for Leica Survey Products. *Id.* at ¶35.

From 2004 through 2006, TPSG also purchased $1,375,972 of Survey Products' inventory. Menzel Aff., Ex. J; Ex. F at ¶16, Ex. 8. Upon Leica's unlawful termination of the Survey Contract, TPSG had $211,641 Leica Survey Product inventory remaining. *Id.*, Ex. B at 114:5-15; Ex. H at 2. TPSG was able to sell only a portion of that inventory, and was left with $167,197 in inventory for which it was unable to recoup. *Id.*, Ex. H at 2; *see also id.*, Ex. H at Exs. A and C; *Cent. Corp.*, 681 N.W.2d at 183 and 189 ($60,000-$70,000 in inventory raises a genuine issue of material fact).

TPSG also undertook substantial marketing efforts, including but not limited to displaying and actively marketing Survey Products at tradeshows.[7] Menzel Aff., Ex. F at ¶¶36-41, Exs. 10-12. TPSG also spent $3,000-$4,000 per year on advertising and promoting Survey Products. *Id.*, Ex. F at ¶36.

---

[7] See Section I.B.3, *infra.*

1157885_1.DOC

TPSG advertised the Leica brand on the exterior sign of its building (*id.,* Ex. B at 157:3-7; Ex. F at ¶38, Ex. 11), and throughout the interior of its building (*id.,* Ex. F at ¶39).   TPSG marketed Leica products and used Leica marks and logos at tradeshows.   *Id.,* Ex. A at 72:17; Ex. F at ¶37, Ex. 10.   TPSG distributed Leica promotional materials.   *Id.,* Ex. F at ¶40.   TPSG included the Leica logo on its trucks, shirts worn by TPSG employees, letterhead, business cards, and print advertising such as trade magazines.   Supplemental Affidavit of Clifford J. DeTemple, dated October 6, 2014, at ¶2; Menzel Aff., Ex. F at ¶¶40-41, Ex. 12.   The Leica branding was also featured on TPSG's website.   *Id.* at ¶41.   *See also*, *id.*, Ex. A at 38:18-23.   This type of advertisement at the very least raises a genuine issue of material fact. *Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 154-55 (Wis. 2006) (dealer's use of grantor's logo or trademark in Yellow Pages advertisements, calendars sent to customers, and solicitation letters to potential customers satisfied facet).

These investments were specific to Leica Survey Products.   While the building's space may be repurposed, other investments, like showroom inventory, could not be recovered.   Menzel Aff., Ex. H at 2 and Ex. H at Exs. A and C.   Based on the percentage of TPSG sales and profits attributable to

Leica Survey Products, and the substantial sunk investments TPSG made into Leica Survey Products, there are genuine issues of material fact with respect to whether Leica had TPSG "over a barrel."

    **C.**    **TPSG either satisfies the other *Ziegler* facets, or raises genuine issues of material fact.  Summary judgment cannot be granted.**

With respect to the remaining *Ziegler* facets, the evidence shows they are either met, or there are genuine issues of material fact.

    **1.**    **Leica imposed significant obligations upon TPSG.**

Leica claims it did not impose significant obligations upon TPSG.  Its argument is based on the Survey Contract's terms.  However, this is only part of the proper analysis as the "actual dealings" of the parties must also be considered.  *Cent. Corp.,* 681 N.W.2d at 188.  These "actual dealings" show the significance of the obligations Leica imposed upon TPSG.

First, the parties disagree whether there was coordination in setting performance targets.  Menzel Aff., Ex. C at 45:25-46:6; Ex. A at 81:3-7.  If Leica unilaterally imposed the targets, Leica had TPSG "over a barrel." Meanwhile, cooperation in setting targets would suggest interdependence. *Ziegler*, 407 N.W.2d at 881 ("Several factors … indicate a level of interdependence [including] Rexnord and Ziegler together are to set sales

targets ....."); *Guderjohn,* 507 N.W.2d at 120 (noting a lack of cooperation in setting sales targets weighs against a finding of interdependence). Further, when TPSG was struggling to meet its performance targets, Leica met with TPSG and formulated an improvement plan. Menzel Aff., Ex. C at 44:18-25, 100:4-8; 101:1-10. There was an interdependent relationship between TPSG and Leica. *Guderjohn,* 507 N.W.2d at 120.

Second, Leica set the maximum price for which TPSG could sell products. Leica admits it has a direct sales staff which would compete with TPSG and sell products in TPSG's designated territory. Menzel Aff., Ex. D at 191:12-21. On more than one occasion, TPSG lost sales because Leica sold its product for less than TPSG offered to sell the same product. *Id.,* Ex. A at 109:3-20, 163:23-164:11. Through its direct sales staff, Leica set the maximum price at which TPSG could sell Survey Products.[8] Leica also set the minimum price at which TPSG could sell Survey Products, *i.e.,* the wholesale price at which TPSG would purchase Survey Products from Leica.[9]

---

[8] It defies logic for TPSG to try to sell Survey Products at a price greater than Leica's own sales staff.

[9] Selling Survey Products for less than the wholesale price would result in a loss. It is illogical for TPSG to do so.

1157885_1.DOC

Finally, Leica also specifically requested that TPSG obtain or acquire space for a showroom to promote Leica products, which TPSG did by purchasing a building in Milwaukee. *See* Section II.B.2, *supra*.

Leica's actual dealings with TPSG did, in fact, impose significant obligations upon TPSG. There is a genuine issue of material fact with respect to this facet of the *Ziegler* analysis.

### 2.  A large majority of TPSG's time and revenue was devoted to Leica products.

The percentage of revenue TPSG derived from Leica Survey Products is significantly greater than other cases where a community of interest was held to exist. For example, in *Sales & Mktg. Assoc.,* the percentage was 23%. *Id.,* 57 F.3d at 606. In *Frieburg Equip.,* the percentage was just 11%, yet the court held this was enough if other characteristics existed. *Id.*, 978 F.2d at 400; *see also Guderjohn,* 507 N.W.2d at 119 (sales of 19% to 26% "tend[ed] to show a community of interest.").

As for time invested in a grantor's products, cases have held that 50% of time spent on selling or marketing a grantor's products is enough to raise a genuine issue of material fact. *Brio Corp.*, 690 F.Supp.2d at 744; *see also Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 741 and 744-45 (7th Cir.

1989) (spending 70 hours per week, 9 months per year, is enough to satisfy this facet).

TPSG's revenue from Leica Survey Products grew from 65.4% in 2004 to 80.5% in 2006. Menzel Aff., Ex. J; Ex. F at ¶15, Ex. 8.[10] Furthermore, starting in 2004, DeTemple devoted nearly 100% of his time to Leica Products. *Id.*, Ex. F at ¶46. In 2005, TPSG hired three individuals who devoted practically all of their time to selling and marketing Leica products, with approximately 75% devoted specifically to Survey Products. *Id.* Similar to 2005, TPSG's sales staff devoted all of their time to Leica products, and about 75% to Survey Products in 2006. *Id.* at ¶45.

The proportion of revenue generated from Leica Survey Products and time devoted to selling and marketing Leica Survey Products shows a community of interest exists.

### 3. TPSG extensively used Leica's trademarks and logos.

A dealer makes "sufficient use of a trademark where 'the trademark of the grantor or of the dealership is often prominently displayed for several purposes, including as an implicit guarantee of certain quality of product and service,' or in other words, where the alleged dealer has made a substantial

---

[10] See Section II.B.1., *supra.*

investment in the trademark." *Moodie*, 889 F.2d at 743 (quoting *Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 66 (Wis. 1981)); *see also Van Groll v. Land O'Lakes, Inc.*, 310 F.3d 566, 570 (7th Cir. 2002) ("defining 'dealership' in terms of trademark use is meant to protect against situations in which a dealer spends money advertising for or promoting a company, an investment that is lost when the company terminates the relationship"); *Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 154-55 (Wis. 2006) (dealer's use of grantor's logo or trademark in Yellow Pages advertisements, calendars sent to customers, and solicitation letters to potential customers satisfied facet); *Moodie*, 889 F.2d at 743 (*de minimus* use of a grantor's trademark on the dealer's business cards insufficient for purposes of the WFDL); *Foerster*, 313 N.W.2d at 67 (same).

Leica does not dispute it allowed TPSG to use Leica trademarks and logos extensively. TPSG had Leica marks and logos on the exterior sign of its building (Menzel Aff., Ex. B at 157:3-7; Ex. F at ¶38, Ex. 11), and throughout the interior of its building (*Id.,* Ex. F at ¶39). TPSG created a Leica-specific showroom which predominantly featured Survey Products. *Id.,* Ex. F at ¶32. TPSG marketed Leica products and used Leica marks and logos at tradeshows. *Id.,* Ex. A at 72:17; Ex. F at ¶37, Ex. 10. TPSG

distributed Leica promotional materials. *Id.,* Ex. F at ¶40. TPSG included the Leica logo on its trucks, shirts worn by TPSG employees, letterhead, business cards, and print advertising such as trade magazines. Supplemental Affidavit of Clifford J. DeTemple, dated October 6, 2014, at ¶2; Menzel Aff., Ex. F at ¶¶40-41, Ex. 12. The Leica logo was also featured on TPSG's website. Menzel Aff., Ex. F at ¶41.

The evidence in this case shows this facet is met. In the alternative, there is a genuine issue of material fact with respect to this facet.

### 4.    TPSG's personnel was substantially devoted to Survey Products.

The extent to which a dealer's personnel were devoted to the grantor's products must also be considered. In *Brio Corp.,* the court ruled there was a genuine issue of material fact when the dealer had one employee devoted to the grantor's products, and its employees spent over 50% of their time focused on the grantor's products. 690 F.Supp.2d at 748-49; *see also Moodie,* 889 F.2d at 744 (hiring two part-time employees meets *Ziegler* criteria to find community of interest is satisfied).

When TPSG began selling Survey Products in Wisconsin in 2004, it did not have a sales staff. Menzel Aff., Ex. F at ¶43. However, in 2005, TPSG hired three individuals. These individuals spent approximately 75% of their

1157885_1.DOC

time devoted to selling and marketing Survey Products. *Id.* at ¶44. In 2006, one of TPSG's employees voluntarily resigned. Nonetheless, TPSG replaced that individual with another sales person. Similar to 2005, TPSG sales staff devoted about 75% of its time to Survey Products. *Id.* at ¶45.

The amount of time TPSG employees devoted themselves to selling and marketing Leica Survey Products exceeds that in other cases where courts ruled this facet was met. This raises a genuine issue of material fact.

### 5.   TPSG spent significant amounts to advertise and promote Survey Products and services.

The showroom used specifically to advertise and promote Survey Products was housed in the building TPSG purchased for $245,000. Menzel Aff., Ex. A at 89:7-90:9; Ex. F at ¶30, Ex. 9. The Survey Product display models used in the building cost $200,000. *Id.,* Ex. F at ¶35. These are significant advertising and promotional expenses incurred by TPSG.

Furthermore, as set forth above, TPSG spent $3,000-$4,000 per year on signage and display unites for tradeshows, building exterior and interior signage, print advertising in trade magazines, letterhead, business cards and TPSG's website. Menzel Aff., Ex. F at ¶36; Ex. A at 38:18-23. TPSG's advertising expenses were significant.

### 6.    Leica limited TPSG's sales territory.

In *H. Phillips Co., Inc. v. Brown-Forman Distillers Corp.*, the court said that in determining whether an alleged grantor has a continuing financial interest in the relationship with the alleged dealer, "[t]he most persuasive objective factor would be whether a particular 'dealer' is the only sales outlet for the manufacturer within a defined territory[.]"  483 F.Supp. 1289, 1292 (W.D. Wis. 1980); *see also Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.*, 846 F.2d 1095, 1098 (7th Cir. 1988) (lack of exclusive territory weighs against community of interest); *Guderjohn*, 507 N.W.2d at 120 (same).

The Survey Contract clearly sets forth that TPSG's territory was the State of Wisconsin, excluding 18 counties in the northwestern portion of the state.  Menzel Aff., Ex. F at ¶9, Ex. 2.  Leica directs its dealers to only sell products in their designated geographical territory.  *Id.*, Ex. C at 153:22-154:9.  In situations where dealers are contacted by potential customers outside their designated territories, the dealers are directed to contact the appropriate dealer in that potential customer's territory.  *Id.*, Ex. D at 42:3-17.  The Survey Contract and Leica's dealings with TPSG show that Leica

limited TPSG's sales territory.  There is a genuine issue of material fact as to whether Leica limited TPSG's sales territory.

### 7. TPSG provided its customers additional services, which TPSG relied upon for sales of Survey Products.

Providing supplementary services to customers weighs in favor of finding a community of interest.  For example, in *Brio Corp.*, the court found that investing in an employee dedicated to handle customer services of a grantor's products and in replacement parts raised a genuine issue of material fact with respect to whether a community of interest exists.  690 F.Supp.2d at 749-50; *see also Cent. Corp.,* 681 N.W.2d at 182, 189 (sales of other products due to services provided is relevant in WFDL community of interest inquiry)

Leica admits it authorized TPSG to carry out certain after-sales service for Survey Products bought and sold under the Survey Contract.  Dkt. 74-1, Def.'s Mem. at 4.  While TPSG did not have the capability to handle all service and repairs of Survey Products internally, it relied upon the Service Contract to foster its relationship with existing customers and to market itself as a full-service dealer of Survey Products.  Menzel Aff., Ex. A at 112:2-24, 113:10-19.  This facet is met, or at the very least, TPSG has raised a genuine issue of material fact.

8.    **The length of the relationship between TPSG and Leica is not dispositive.**

While the length of the relationship between the parties is a significant factor, it is not dispositive.   In *Ziegler*, the court reversed the court of appeals' decision, which had granted the grantor's motion for summary judgment, despite the agreement between the parties lasting 3 years.   407 N.W.2d at 882-83; *see also Moodie*, 889 F.2d at 741 and 744-45 (5 years relationship enough to find community of interest satisfied); *Super Natural Distributors, Inc. v. Muscletech Research and Development*, 196 F.Supp.2d 761, 775 (E.D. Wis. 2002) (four year relationship weighs only slightly against finding of community of interest); *Brio Corp.*, 690 F. Supp.2d at 742-43 and 751-52 (while a 4½-year relationship weighed against a finding of a community of interest other facets required denial of the grantor's motion for summary judgment).

The length of the parties' relationship cannot be viewed in a vacuum. While Leica terminated the agreement with TPSG after 3½ years, Survey Product technology changed on an annual basis.   Supplemental Affidavit of Clifford J. DeTemple, dated October 6, 2014, at ¶3.   Furthermore, as set forth above, there are many facets which favor TPSG, and others which raise genuine issues of material fact.

1157885_1.DOC

## **CONCLUSION**

As set forth above, Leica had TPSG "over the barrel."  Furthermore, the remaining *Ziegler* facets show either that TPSG shared a "community of interest" with Leica, or raise genuine issues of material fact.  Therefore, Leica's motion must be denied.

Dated:  October 6, 2014

BY: s/Benjamin A. Menzel
Paul R. Hoefle, Esq. (WI #1005647)
Benjamin A. Menzel, Esq. (WI #1041472)
The Schroeder Group S.C.
20800 Swenson Drive, Ste. 475
Waukesha, WI  53186
Tel: (262) 754-1306
prh@tsglaw.com
bam@tsglaw.com
*(Pro Hac Vice)*

John V. Burch, Esq. (GA #094900)
Bovis Kyle & Burch, LLC
200 Ashford Center North
Suite 1500
Atlanta, GA  30338
Tel:  (770) 391-9100
jburch@boviskyle.com
*Counsel for Plaintiff Cliff DeTemple d/b/a Turning Point Systems Group*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion has been prepared in Times New Roman 14 font and is in compliance with Local Rule 5.1.

By:  s/ Benjamin A. Menzel
Paul R. Hoefle
Wisconsin Bar No. 1005647
Benjamin A. Menzel
Wisconsin Bar No. 1041472
*(Pro Hac Vice)*

John V. Burch
Georgia Bar No. 094900

LOCAL COUNSEL FOR
PLAINTIFF CLIFF DETEMPLE
D/B/A TURNING POINT SYSTEMS
GROUP